**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**APRIL 14, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Guardianship of: | ) | |
| | ) | No.  37834-9-III |
| JOAN N. MESLER, | ) | |
| | ) | PUBLISHED OPINION |
| An Alleged Incapacitated Person. | ) | |
| | ) | |

STAAB, J. — Joan Mesler appeals the superior court's order authorizing professional guardian fees and costs to be paid from her estate in the amount of $54,224.59 for guardian services provided during a period of 17 and one-half months. She raises numerous issues and challenges dozens of the court's findings of fact and conclusions of law.  Mesler's primary challenge, however, is that the trial court erred in finding that these fees were necessary, reasonable, and beneficial to her person and estate.

Preliminarily, we reject Mesler's argument that our review is de novo and confirm that a superior court's award of guardian fees will be reviewed for abuse of discretion. We conclude, however, that in this case the court abused its discretion in several ways. First, by refusing to consider the *Standards of Practice Regulations* for certified professional guardians (CPG Standards) that set the minimum duties of certified professional guardians.  In addition, the trial court's generalized findings of facts and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

conclusions of law are insufficient to provide meaningful review. In order to justify her fees, the guardian must demonstrate that the services provided were necessary, reasonable, and beneficial. When extraordinary fees such as this are requested, the guardian carries the burden of providing the court with a breakdown of charges by the task performed and the time spent on each task, along with the rates billed and the total charges. The superior court needs to make detailed findings reflecting the time spent on each category of tasks, the rate billed for those tasks, and the total charges.

In this case, the parties disputed the guardian's fees. They presented disputed evidence on the time spent on different tasks and the rates charged for those tasks. The trial court made generalized findings that the time expended and the rates charged were reasonable and necessary, but failed to place the burden on Kristyan Calhoun to present the court with billing information that would allow the court to independently evaluate the fees requested. The generalized findings are insufficient to support the court's conclusions that all of the fees proposed by Calhoun were necessary, reasonable, and beneficial.

While we remand for the court to enter more specific findings on the fees charged by the guardian, we affirm the court's approval of fees paid to HopeBridge Home Health for personal care. Payment to HopeBridge was specifically approved by the court in its initial budget and, unlike guardian fees, those fees are not subject to subsequent review. We also reject Mesler's evidentiary challenges. Even when evidence is presented by

2

No. 37834-9-III
*In re Guardianship of Mesler*

declaration, as the fact finder, the trial court is charged with determining the weight and credibility assigned to disputed evidence. The trial court did not abuse its discretion in rejecting Mesler's argument that Calhoun's for-profit business model created a conflict of interest. Calhoun's profit margin is irrelevant. The question before the court is whether the services and fees were necessary, reasonable, and beneficial.

## BACKGROUND

Joan Mesler is an elderly widow. In 1995, she suffered a stroke that paralyzed the right side of her body and left her with chronic pain. The stroke also impacted her speech, vision, balance, and memory. She has difficulty with numbers and gets easily frustrated. In December 2017, Mesler's husband died. Up until his death, the husband had managed the couple's finances. After Mesler's husband died, her four adult children disagreed about her ongoing care and finances. Shortly after her father's death, Janice Vickers, took her mother to an attorney and had her sign a durable power of attorney. The power of attorney was quickly revoked when the other adult children learned of it. At one point, a physical altercation took place with Mesler removing her adult son, Richard Mesler, from her home. There were numerous allegations among the siblings of theft and undue influence.

In January 2018, Vickers petitioned for a limited guardianship of Mesler's person and estate. A medical evaluation was ordered and a guardian ad litem (GAL) was appointed to investigate and report on Mesler's personal and financial needs. The GAL

No. 37834-9-III
*In re Guardianship of Mesler*

recommended a limited guardianship of Mesler's person and estate. The GAL reported that Mesler was capable of caring for herself and taking care of daily needs, but could use some assistance with certain tasks. "Her degree of physical incapacity is moderate, but communication incapacity as well as financial calculation incapacity and her inability to read are severe. Her cognitive and comprehension limitations are few, with trusted assistance," but she could be vulnerable to financial exploitation, especially on more complex financial concerns. Clerk's Papers (CP) at 961. The GAL indicated that Mesler was in need of some assistance with her daily activities such as bathing, cleaning, laundry, and meal preparation. She also needed assistance with shopping, transportation, and financial matters. The GAL reported that Mesler recognized that she needs assistance, but vacillated on whether she wanted a guardian.

The neuropsychologist, Dr. Jane Thompson, PhD, described Mesler's capabilities and limitations. After a medical examination, Dr. Thompson indicated that the stroke had impacted Mesler's expression and comprehension. She could no longer speak, read, or perform math calculations. In addition, she lived with chronic pain. Nevertheless, Dr. Thompson concluded that Mesler "does not appear to be dementing" and was "decisional." CP at 979. Dr. Thompson confirmed that Mesler was capable of taking care of her daily needs and had impeccable grooming and hygiene, but she did need help with cooking, transportation, shopping, and paying bills.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

Dr. Thompson recommended that "[g]iven the extreme level of rancor, accusations, and mistrust among her children, Ms. Mesler's finances, including the nuts and bolts of banking and paying bills, should be handled by an unrelated third party." CP at 980. Dr. Thompson also recommended that a limited guardian be appointed and in-home care service be provided to assist with daily living needs. While Dr. Thompson did not feel the need for full-time assistance, she recommended that Mesler have daily contact with someone to monitor her safety and ensure her needs were met.

Based on these recommendations, the court appointed Kristyan Calhoun, a certified professional guardian, as the limited guardian of Mesler's person and estate. Calhoun is a certified professional guardian and operates a professional guardian agency called Senior Avenues. The order appointing a limited guardian provided that Mesler would retain certain rights, including the right to consent to or to refuse medical treatment, but her right to choose who would provide care and assistance was revoked. The order also provided for a monthly allowance of $300 toward guardian fees, subject to final approval by the court.

Shortly after her appointment as Mesler's limited guardian, Calhoun petitioned for, and obtained, a vulnerable adult protection order protecting Mesler from her adult son, Richard, on the basis of "physical, emotional and financial exploitation." CP at 890.

No. 37834-9-III
*In re Guardianship of Mesler*

Within 90 days of being appointed, Calhoun filed an inventory, personal care plan, and proposed budget. The personal care plan indicated that Calhoun had contracted with HopeBridge, a third party caregiving service, to provide six hours of daily care to Mesler, in two three-hour shifts at a rate of $4,500.00 per month. Calhoun also sought guardian fees for three months totaling $17,309.42. In addition, she indicated that while the court had set a monthly budget of $300.00 for her fees, she was requesting that she be allowed to pay herself her fees as they were incurred, without prior court approval, but subject to final review and approval by the court. On July 31, 2018, the court adopted the proposed care plan, budget, and disbursements, including the request to pay guardian fees as they were incurred without prior court authorization.

Over the next several months, Mesler made it difficult for the care providers to provide in-home care services. She would often refuse care. When she did so, the care providers would contact Calhoun who would visit Mesler to ensure that her needs were being met. Other times, Calhoun or her staff would visit Mesler, providing services such as grocery shopping, picking up mail, and running errands.

Mesler did not know the extent of her assets. Because Mesler could not communicate, Calhoun had to take the steps necessary to locate property and make sure it was being managed. It was learned that two of Mesler's children had control over two of her properties and were not paying rent, but it was not clear if this was what Mesler wanted. On two occasions, Calhoun sought clarifying instruction from the court with

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

respect to the limited guardian's duties to the preservation of the assets as well as treatment of the income from the assets that were not in Mesler's control.

In April 2019, attorney Dan Young sought appointment as Mesler's counsel. Calhoun objected to the motion, suggesting that Young had been contacted by one of Mesler's children and he had a history of contentious litigation against Calhoun in other cases. The court appointed a GAL to determine if Mesler wanted Dan Young to represent her. The GAL confirmed that Mesler wanted Young to review her estate planning and represent her in the guardianship. The GAL also advised the court that Mesler expressed that she did not want a guardian and did not want the in-home caregivers. Ultimately, the court appointed Young as Mesler's attorney.

Shortly thereafter, Calhoun submitted her intent to resign as Mesler's guardian. The court again appointed a GAL to determine if the guardianship should continue and, if so, under what terms. While the GAL recommended that the guardianship continue with appointment of another certified professional guardian, the GAL also recommended that the new guardian work with Mesler to ensure her personal and financial concerns were met. The GAL also recommended that the court reinstate Mesler's right to decide who provided her care. The GAL noted that the case was particularly challenging because of Mesler's inability to communicate and the frequency with which she changed her mind.

Calhoun submitted her petition for approval of her final report as guardian. Within this petition, she requested court approval of $54,224.59 in guardian fees and

No. 37834-9-III
*In re Guardianship of Mesler*

costs from July 16, 2018 to December 31, 2019. The petition indicated that Calhoun had already paid herself the majority of these fees, with an unpaid balance of $2,102.85. In support of the request for fees, Calhoun submitted 53 pages of single-spaced billing statements setting forth, in chronological order, the time that Calhoun and her staff had spent on Mesler's guardianship.

Through her attorney, Mesler objected to the fees requested by Calhoun, arguing that they were excessive, unnecessary, and unreasonable. Mesler pointed out that Calhoun's fees averaged 10 times the budgeted amount of $300 per month. Mesler argued that Calhoun's billing statements were not transparent because the statements were set out in chronological order, which made it difficult to determine the nature of the work performed, the rates charged, and the fees billed for particular tasks. Mesler also asserted that Calhoun's for-profit business model was contrary to her fiduciary duty to reduce costs and protect the estate.

In support of her objections, Mesler submitted declarations from expert witnesses on the reasonableness of Calhoun's fees and hourly rates. William Dussault, an attorney with experience in guardianship law, submitted a declaration on behalf of Mesler. After reviewing Calhoun's billing statements, he testified that the rates being charged and the amount of time spent on particular tasks was unnecessary and unreasonable. Mr. Dussault indicated that Calhoun's billing statements made it difficult to determine charges by task and determine hourly rates for those tasks. Some tasks were billed at

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

different rates depending on the person who performed the task. Some of the billings indicated excessive rates such as $70 per hour for clerical work. He also opined that the total amount of fees requested was unreasonable, noting that a reasonable monthly rate for individuals receiving state or federal support was $175 per month. Typical pay for private pay is $500 per month.

Mr. Dussault also testified regarding the fees charged for certain categories of tasks. With the assistance of another witness, Mr. Dussault was able to break down Calhoun's billing statements by task, rate of billing, and charges. Some of his findings are as follows:

1. Calhoun appears to have charged over $5,000.00 to prepare the final report when a charge of $1,000.00 to $2,000.00 is generally reasonable for this task.

2. It appears Calhoun billed for 41.21 hours of bookkeeping at an average rate of $109.82 per hour. A reasonable rate for bookkeeping is $50.00 per hour.

3. It appears that Calhoun charged 82.93 hours for clerical work at an average hourly rate of $104.21. This included scanning, phone calls, receiving information and relaying messages. He opined that these charges should be part of the overhead built into the hourly rate.

4. There were 191 entries at an average rate of $96.82 per hour for tasks such as staffing, meetings, and forwarding e-mails.

5. Total charges for errands appear to be over $7,000.00 at an average hourly rate of $76.87. Of these charges, eight guardian visits and nine wellness checks were reasonable for a total charge of $1,340.25. Other charges were unnecessary given that there was already a caregiver company providing six hours of care per day.

6. Charges totaling $4,275.00 for caregiver coordination is excessive.

9

No. 37834-9-III
*In re Guardianship of Mesler*

*See* CP at 412-18.

Mesler's successor guardian joined in her objections to Calhoun's fees.

Calhoun denied these allegations and submitted her own evidence. While acknowledging the substantial fee request, she argued that the guardianship of the estate was complex and the guardianship of the person was contentious. She countered that her billing entries were set forth in chronological order and provided sufficient details. Calhoun testified that she charged $125 per hour for guardian case management, $85 per hour for skilled case management (which can include clerical and support work), and $50 per hour for shopping, errands, and basic tasks. While indicating that these were the rates for various tasks, she did not testify that these rates were actually applied based on the task performed. Instead, she asserted that when billing entries described tasks that appeared to be clerical or errands, but were charged at a higher rate, it was because additional skilled case management was involved in those tasks. For example, entries for scanning documents charged at $125 per hour included Calhoun's review of that information in her capacity as a guardian. She did not group the billing entries by task or provide details about which entries that were categorized as clerical also included skilled review.

Calhoun submitted declarations from her own expert witnesses. Attorney Joshua Brothers provided a declaration in support of Calhoun's fees. He testified that he has experience in guardianship law and representing guardians. He is familiar with the CPG

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

Standards established by the Washington State Certified Professional Guardianship and Conservatorship Board (CPG Board). These CPG Standards provide that the hourly rates charged by certified professional guardians should be based on the type of work performed. Brothers gave examples of fees from other guardian agencies of $45 per hour for clerical work, $80 per hour for asset administration and support services, and $100 to $125 per hour for financial and property management. He testified that Calhoun's billing rates were reasonable and appropriate.

Brothers acknowledged that the Washington State Health Care Authority capped general guardian fees at $235 per month, but declared that this amount was too low for most guardians and, in his experience, most guardians sought exceptions to that amount. He did not provide an estimate of what a reasonable guardian fee would be and he did not provide an opinion on whether Calhoun's fees in this case were necessary, reasonable, or beneficial. He did provide examples of fees charged in other complex guardian cases, noting fees of $13,000 and $22,000 in recent cases.

Shanna Kelly-Bailey, the Director of Human Resources and Quality Assurance for HopeBridge, also filed a declaration in support of Calhoun. She declared that over the course of the guardianship, there were several instances when Mesler would deny HopeBridge caregivers entry into her home. When this would occur, they would contact Calhoun.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

The court held a hearing to determine the amount of guardian fees to authorize. The court questioned Calhoun, although she was not placed under oath and the court did not invite the attorneys to examine her. The information she provided was consistent with her declarations.

In its oral ruling, the court recognized that the fees requested were significant. The court recognized that several circumstances increased the complexity of this guardianship, including Mesler's inability to speak, the family dynamics, and frequency with which Mesler changed her mind on the extent of care she wanted. The court also summarized Dr. Thompson's initial findings, noting that Dr. Thompson found that Mesler was vulnerable and subject to manipulation and recommended that she have daily in-home care services.

The court then addressed Mesler's specific objections, rejecting each one in turn. Notably however, in rejecting each of Mesler's arguments and issues, the court seemed to take a position that Mesler had failed to meet a burden of showing that the fees were unwarranted without placing a corresponding burden on Calhoun to demonstrate that her fees were necessary, reasonable, and beneficial.

For example, while the court found that Calhoun's billing statement, provided in chronological order, adequately described the services provided, it rejected Mesler's argument that the billing entries should be organized by task. Instead, the court noted that when a senior law partner performs legal work, he charges at a higher rate than a

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

junior associate who may perform the same work. Addressing Mesler's argument that much of the work contained in the billing statements was for clerical work that should be billed at a lower rate, the court found that Mesler's witness, who provided a breakdown of the billing by task was not qualified to categorize Calhoun's billing statement. The court did not require Calhoun to provide this information. Instead, the court accepted Calhoun's testimony that if an entry appeared to be for clerical work, but was charged at a higher rate, it was because there was more to the work than described. Summarily, the court found that the rates charged and the total fees were reasonable.

The court then went through certain tasks and found the charges reasonable. In finding that a total charge of $5,100 to prepare the final report was reasonable, the court noted:

> The argument that $5,100 for the final report is excessive, the argument was that the preparation was inefficient because it started and stopped. Well, stuff happens. You don't always get the chance to sit down and work on a project when you have—particularly when you are the sole person in charge of your business, and you have multiple clients, you have multiple people working for you and those people have multiple clients to deal with, nobody necessarily has a big chunk of time where they can sit down and just work on one project. Interruptions happen, lawyers happen, and these things all make things more complicated.

Report of Proceedings (RP) at 71.

As to a gazebo that was built for Mesler, the court found that Mesler wanted it and then changed her mind, so those fees were reasonable. The court found that fees charged

13

No. 37834-9-III
*In re Guardianship of Mesler*

in an attempt to install a security system were reasonable even though Mesler did not

want the system:

> [T]his is one of these places where maybe she didn't want it, but it was
> certainly reasonable under the circumstances for the guardian to install the
> system in an effort to try to protect and keep Ms. Mesler safe, even if that's
> not what she wanted, and again, the issue here is not what did Ms. Mesler
> want or what does she think now that she wanted back then. The issue is
> what was reasonable or what was necessary and what was for her benefit.

RP at 76.

As to the $4,275 for caregiver coordination, the court found that Mesler's experts

did not appreciate that Mesler was actively resisting efforts to help her. Therefore,

Calhoun was "entitled to be compensated for that time." RP at 77. The court rejected

Mesler's own declaration, finding that she did not write it herself so it was unconvincing.

In the end, the court noted that it is "easy after the fact to say, well, you should have done

this or you shouldn't have done that, but that's not the standard. The standard is what

was reasonable and necessary at the time." RP at 80.

The court's written findings found that Mesler's guardianship was complex and

contentious. Similar to its oral ruling, however, the court found that Mesler had not met

14

No. 37834-9-III
*In re Guardianship of Mesler*

her burden of showing that Calhoun's fees were excessive.[1]  In conclusory fashion, the

court found that the time expended and the rates charged for various tasks were

necessary, reasonable, and beneficial.  Calhoun's billing statements were provided in

chronological format, which is customary for guardianship billings, and no legal

authority was provided that requires a guardian's bill to be in any other form.  The court

also found that as a professional guardian, Calhoun could not delegate work and had a

duty to oversee and manage all work performed on Mesler's estate.  The court accepted

Calhoun's explanation that "[t]asks done by Ms. Calhoun and her staff that appear to be

clerical in nature in a billing entry would frequently include a myriad of other

guardianship related tasks that require more skilled knowledge and case management."

CP at 892 (FF 1.21).

While the court's findings and conclusions were generally conclusory, it did make

detailed findings for one task: the transfer of Mesler's vehicle to her grandson.  For this

task, the court noted the extra steps that were needed to transfer the title, including

obtaining permission from the court, obtaining a lost title, and transferring the vehicle

---

[1] "Ms. Mesler provided no persuasive evidence that any of Ms. Calhoun or her staff's fees and services were unreasonable, unnecessary or not to her benefit."  CP at 896 (Finding of Fact (FF) 1.55).

"Ms. Mesler failed to provide competent, admissible expert witness testimony regarding whether the guardian's fees and services were reasonable, necessary and to the benefit of Ms. Mesler."  CP at 898 (Conclusion of Law (COL) at 2.21).

15

No. 37834-9-III
*In re Guardianship of Mesler*

into Mesler's name so that it could then be transferred to the grandson. The court found these services were necessary, reasonable, and beneficial.

Otherwise, the findings noted generally that the guardianship was complex because of Mesler's limitations, the family dynamics, and the assets. The court did not make particularized findings that Calhoun billed a certain number of hours for a certain type of work at a particular rate. In the end, the court concluded that

> [t]he fees and costs incurred and services provided by Ms. Calhoun in the Guardianship of Joan N. Mesler in the amount of $52,313.55 for fees and in the amount of $1911.04 for costs for a total of $54,224.59 for the period from July 16, 2018 through December 31, 2019 were reasonable, necessary and benefitted Ms. Mesler.

CP at 898 (COL 2.22).

## ANALYSIS

A.   STANDARD OF REVIEW

Before we consider the substantive claims, we must decide the standard of review. Mesler contends that since the evidence was largely submitted by declarations, this court sits in the same position as the trial court and should review the evidence de novo. We disagree. First, there was some live testimony provided by Calhoun. The remaining evidence was submitted by declaration in lieu of live testimony at the suggestion of Mesler's attorney. Second, the evidence in this case was disputed. In order to resolve the issue of fees, the trial court was required to determine facts from disputed evidence and

16

No. 37834-9-III
*In re Guardianship of Mesler*

weigh competing interests. In resolving the conflicting evidence, the court issued findings of fact and conclusions of law.

We reject Mesler's invitation to apply a de novo standard and adhere to an abuse of discretion standard for reviewing the trial court's decision on the award of fees. *In re Guardianship of Lamb*, 173 Wn.2d 173, 183-84, 265 P.3d 876 (2011). While Mesler points out that the evidence here was largely documentary, this is so because the parties authorized the trial court to make findings of fact on a contested written record. Even when evidence is presented largely in documentary form, a trial court is in a better position to determine factual disputes because it has a more extended opportunity to consider the evidence, hear arguments, question counsel, and clarify conflicts in the record. *See Dolan v. King County*, 172 Wn.2d 299, 311, 258 P.3d 20 (2011).

The substantial evidence standard is "more appropriate, even if the credibility of witnesses is not specifically at issue, in cases such as this where the trial court reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issues statutorily mandated written findings." *Id*. Under this standard, appellate review is limited to determining "whether the court's findings are supported by substantial evidence and, if so, whether the findings support the court's conclusions of law and judgment." *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 425, 10 P.3d 417 (2000).

17

No. 37834-9-III
*In re Guardianship of Mesler*

Overall, we consider the award of fees for abuse of discretion. *Guardianship of Lamb*, 173 Wn.2d at 183-84. "A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or when untenable reasons support the decision." *In re Guardianship of McKean*, 136 Wn. App. 906, 918, 151 P.3d 223 (2007).

B.      OVERVIEW OF LIMITED GUARDIANSHIPS

In her appeal, Mesler raises issues that require us to step back and consider the overarching goals and presumptions of a limited guardianship before turning to specific issues. In enacting the guardianship chapter, the legislature made it clear that courts should impose the least possible restrictions that will provide needed care while maintaining an incapacitated person's autonomy and self-preservation:

> It is the intent of the legislature to protect the liberty and autonomy of all people of this state, and to enable them to exercise their rights under the law to the maximum extent, consistent with the capacity of each person. The legislature recognizes that people with incapacities have unique abilities and needs, and that some people with incapacities cannot exercise their rights or provide for their basic needs without the help of a guardian. *However, their liberty and autonomy should be restricted through the guardianship process only to the minimum extent necessary to adequately provide for their own health or safety, or to adequately manage their financial affairs.*

Former RCW 11.88.005 (1990) (emphasis added).

A "guardianship" is a "'trust relation of the most sacred character.'" *In re Guardianship of Eisenberg*, 43 Wn. App. 761, 766, 719 P.2d 187 (1986) (quoting

18

No. 37834-9-III
*In re Guardianship of Mesler*

39 AM. JUR. 2D *Guardian & Ward* § 1 (1968)). "'The court having jurisdiction of a guardianship matter is said to be the superior guardian of the ward, while the person appointed guardian is deemed to be an officer of the court.'" *Guardianship of Lamb*, 173 Wn.2d at 190 (quoting *Seattle-First Nat'l Bank v. Brommers*, 89 Wn.2d 190, 200, 570 P.2d 1035 (1977)).

Upon petition and following a hearing, a court may establish a full or limited guardianship. Even when a guardianship is established, however, the person shall not be presumed incapacitated, or lose any legal rights, or suffer any legal disabilities except as specifically divested in the order establishing the limited guardianship. Former RCW 11.88.010(2) (2016). The court shall impose only such limitations and restrictions as are necessary to protect and assist the incapacitated person. *Id*.

Guardians are appointed by the court under the authority granted by former chapters 11.88 RCW and 11.92 RCW. A person who is compensated for serving as a guardian for more than two persons is considered a professional guardian and must be certified. Former RCW 11.88.008 (1997). GR 23 was created to "establish[ ] the standards and criteria for the certification of professional guardians and conservators as defined by RCW 11.130.010(26) and prescribes the conditions of and limitations upon their activities." GR 23(a). GR 23(c) establishes the CPG Board. The CPG Board is charged with oversight of the certification, regulation, investigation, and discipline of professional guardians and conservators. GR 23(c)(2). Ultimately however,

19

No. 37834-9-III
*In re Guardianship of Mesler*

"'guardianships are equitable creations of the courts and it is the court that retains ultimate responsibility for protecting the ward's person and estate.'" *Guardianship of Lamb*, 173 Wn.2d at 184 (quoting *In re Guardianship of Hallauer*, 44 Wn. App. 795, 797, 723 P.2d 1161 (1986)).

One of the CPG Board's duties is to adopt and implement "policies or regulations setting forth minimum standards of practice that professional guardians and conservators shall meet." GR 23(c)(3)(ii). The purpose of the CPG Standards is to "direct guardians to provide timely and accurate reports to the court, act within the scope of the appointed guardianship, consult with the incapacitated person and defer to that person's autonomous decision-making capacity when possible, cooperate with professional caregivers and relatives of the incapacitated person, and seek independent professional evaluations and opinions when necessary to identify the incapacitated person's best interests." *Guardianship of Lamb*, 173 Wn.2d at 185 (citing CPG Standard 401).

C.    APPLICATION OF CPG STANDARDS

Mesler assigns error to the trial court's refusal to consider the CPG Standards as affecting or setting the minimum standard a guardian must follow. At the hearing for a final accounting and approval of fees, Mesler argued that Calhoun's decisions, practices, and fees violated several CPG Standards. The trial court refused to consider the standards, holding that any such violation of the CPG Standards was a disciplinary issue

20

No. 37834-9-III
*In re Guardianship of Mesler*

or a licensing issue and did not relate to the work performed or the guardian fees being requested. We disagree.

While the CPG Standards certainly apply to the discipline and licensing of certified professional guardians, the CPG Standards also define a professional guardian's obligations and scope of services. The CPG Standards should be considered by a court in determining the duties of the guardian in relation to whether their fees are reasonable, necessary, and beneficial to the person and the estate.

Our Supreme Court has previously relied on the CPG Standards to determine fees in other guardian cases. In *Guardianship of Lamb*, the Supreme Court described the duties of professional guardians with specific reference to the CPG Standards:

> These standards direct guardians to provide timely and accurate reports to the court, act within the scope of the appointed guardianship, consult with the incapacitated person and defer to that person's autonomous decision-making capacity when possible, cooperate with professional caregivers and relatives of the incapacitated person, and seek independent professional evaluations and opinions when necessary to identify the incapacitated person's best interests.

173 Wn.2d at 185 (citing CPG Standard 401).

The CPG Standards are often analogized to the Rules of Professional Conduct (RPC) applicable to attorneys. Courts often refer to the RPCs when determining the reasonableness of an attorney's fees. In *In re Estate of Larson*, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985), the court addressed the reasonableness of attorney fees incurred to probate an estate. Similar to fees generated by a guardian, the court held that probate

21

No. 37834-9-III
*In re Guardianship of Mesler*

attorneys must demonstrate not only that their fees are reasonable, but that they are necessary to probate the estate. *Id.* at 518-19. In considering what was necessary, the court recognized the fiduciary relationships between the attorney, the personal representative, and the estate's beneficiaries. *Id.* at 520-21. The court turned to the RPCs to define the fiduciary relationship and then analyzed the reasonableness of the fees in the context of the duties provided by the RPCs. *Id.* at 521. Noting that estate attorneys have a fiduciary duty to preserve the estate, the court found there was evidence that much of the work performed was excessive, duplicative, and charged at a professional rate for administrative work. *Id.* at 531.

Guardians, like attorneys, are officers of the court. *Guardianship of Lamb*, 173 Wn.2d at 190. Similar to the RPCs, the CPG Standards set the minimum standard of a guardian's fiduciary duty to the person and the estate. The CPG Standards help a court determine the scope of a guardian's duties and authority. This in turn helps determine whether fees for such services are reasonable, necessary, and beneficial.

The CPG Standards address factors such as the guardian's duty to the court, general decision-making standards, and duties in providing services and charging fees. For example, CPG Standard 410.1 provides:

> The guardian is entitled to reasonable compensation for services rendered on behalf of the incapacitated person. The guardian has a duty to conserve the estate of the incapacitated person. Accordingly, decisions to provide services and incur fees shall be made in such a way as to reflect this duty.

No. 37834-9-III
*In re Guardianship of Mesler*

> Services requiring a minimal degree of training, skill and experience should
> be billed accordingly.

Appellant's Opening Br., App. C at 15. In this case, all of the professional witnesses,

including Calhoun and her experts, referred to the CPG Standards when justifying their

fees or the objections thereto.

"The abuse of discretion standard is extremely deferential." *Hoffman v. Kittitas*

*County*, 4 Wn. App. 2d 489, 495, 422 P.3d 466 (2018), *aff'd*, 194 Wn.2d 217, 449 P.3d

277 (2019). Even so, a trial court abuses its discretion when it applies the wrong legal

standard or categorically refuses to consider evidence of a guardian's fiduciary duty.

*See In re Marriage of Leaver*, 20 Wn. App. 2d 228, ___, 499 P.3d 222, 228-29 (2021).

In this case, the trial court abused its discretion when it refused to consider the CPG

Standards for professional guardians in determining whether the fees charged were

reasonable, necessary, and beneficial to the incapacitated person.

D.    ADVANCEMENT OF GUARDIAN FEES

One of the issues raised by Mesler was the "Order Approving Guardian's Initial

Personal Care Plan, Initial Inventory, Budget, and Disbursements" authorizing Calhoun

to pay herself fees as she incurred them, regardless of the monthly allowance provided.

CP at 71-76. When the court appointed Calhoun as a limited guardian, it authorized

Calhoun to take a monthly allowance toward her fees of $300 per month. Three months

later, when Calhoun submitted the "Guardian's Inventory," she requested an order

23

No. 37834-9-III
*In re Guardianship of Mesler*

allowing her fees to be paid as incurred, subject to later review by the court.  CP at 74.

The court granted this request and ordered:

> Guardian's fees and costs are to be paid as incurred and billed on a periodic basis.  The total fees and costs advanced are: (a) ultimately subject to review and approval of the court at the next reporting, and (b) create no presumptions by the Court or the Guardian regarding the reasonableness or necessity of those fees and costs.  Amounts shall be advanced only for actual services provided, and costs actually incurred.

CP at 75.  Over the next 18 months, Calhoun paid herself $54,224.59 in fees from Mesler's assets.  This open-ended order allowing Calhoun to compensate herself without prior court approval was an abuse of discretion.

Guardian fees are governed by former RCW 11.92.180 (1995), which provides that guardian fees are to be fixed by the court at the final or annual reporting.  In the interim, the court may provide for a monthly allowance to be applied toward charges actually incurred.  *Id*.  Under CPG Standard 410.2, "The guardian shall not pay or advance himself/herself fees or expenses from any source except as approved by the court."  Appellant's Opening Br., App. C at 15.

The statute and CPG Standards provide for a monthly allowance.  If Calhoun found her fees to be largely disproportionate to the allowance provided by the court, her remedy was to request modification of the allowance or seek to have the court approve her fees prior to the annual or final reporting.  While the order allowing Calhoun to pay herself fees as they were incurred without prior court approval was an abuse of

24

No. 37834-9-III
*In re Guardianship of Mesler*

discretion, the remedy is not automatic disgorgement of fees. Calhoun is still entitled to guardian fees that are reasonable, necessary, and benefited the person and the estate. But there is no presumption that she is entitled to these fees.

E.     FEES PAID TO CAREGIVER

Mesler challenges the fees paid by Calhoun to HopeBridge for daily in-home care. These fees are different from the fees Calhoun paid to herself for guardian services. On appeal, Mesler argues that she retained the right to decide the scope of her care and never authorized, and continuously objected to, the level of care authorized by Calhoun and provided by HopeBridge. She contends that similar to fees paid for guardian services, the fees paid to HopeBridge are subject to final review to determine if they were necessary, reasonable, and beneficial. We disagree.

Three months after being appointed as Mesler's limited guardian, Calhoun submitted a care plan as required by statute. *See* former RCW 11.92.043(1)(a) (2017). This care plan indicated that HopeBridge had been retained to provide six hours of daily care in two three-hour shifts. The trial court approved of this plan as well as monthly payments to HopeBridge for this care in the amount of $4,500. HopeBridge provided these services regardless of whether Mesler rejected the care on any given day.

Under former RCW 11.92.040(7) (2011), a guardian has a duty to apply to the court for an order authorizing disbursements on behalf of the incapacitated person to pay the agency responsible for the care of the incapacitated person. While the statute

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

indicates that amounts authorized under this section may be decreased or increased from time to time, there is nothing to suggest that the amount authorized and paid to a third-party provider is subject to subsequent review by the court and retroactive disgorgement. HopeBridge is not a party before the court and Mesler provides no reasonable remedy for disgorging those fees. The fees authorized and paid to HopeBridge for services provided are not subject to review at the final accounting.

F.    GUARDIAN FEES REQUESTED BY CALHOUN

Mesler raises several challenges to the fees charges by Calhoun for guardian services and awarded by the court. First, she contends that a substantial amount of the services rendered by Calhoun were not authorized by Mesler, who retained significant rights to control her life. Next, she contends that the trial court erred in finding Mesler's witnesses not competent and disregarding their testimony. Third, she argues that the trial court erred in disregarding evidence of Calhoun's for-profit business model that was structured to generate excessive fees. Overall, she contends that the trial court abused its discretion in determining that the services provided and the fees charged were necessary, reasonable, and beneficial. On review, we conclude that the court's findings of fact are insufficient to provide meaningful review and remand for more specific findings.

*Findings of Fact and Conclusions of Law*

Preliminarily, we note that many of the trial court's findings of fact are actually conclusions of law and vice versa. Findings of fact are a determination of whether the

26

No. 37834-9-III
*In re Guardianship of Mesler*

evidence shows that something occurred or existed. *Casterline v. Roberts*, 168 Wn. App. 376, 382, 284 P.3d 743 (2012). A determination made by a trial court through the process of legal reasoning from the significance of evidentiary facts is a conclusion of law as opposed to a finding of fact. *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 197 n.5, 584 P.2d 968 (1978). A finding of fact that is actually a conclusion of law will be treated as a conclusion of law and will stand if other findings of fact suffice to support such a conclusion. *Miller Lumber Co. v. Holden*, 45 Wn.2d 237, 245, 273 P.2d 786 (1954).

*Standard for Payment of Guardian Fees*

Before addressing Mesler's specific objections, we consider the general standards for payment of guardian fees. The duties, authority, and responsibilities of a guardian are set forth by statute and the order appointing the limited guardian. The overriding presumption is that any limitations placed on a person's rights should be restricted through the guardianship process "only to the minimum extent necessary to adequately provide for their own health or safety, or to adequately manage their financial affairs." Former RCW 11.88.005.

The general duties of a limited guardian are set forth by statute. For instance, a limited guardian shall protect and preserve the guardianship estate. Former RCW 11.92.040(5). The guardian shall apply to the court for orders authorizing disbursements of funds on behalf of the incapacitated person. Former

27

No. 37834-9-III
*In re Guardianship of Mesler*

RCW 11.92.040(7). The guardian's duties include the responsibility "to care for and maintain the incapacitated person in the setting least restrictive to the incapacitated person's freedom and appropriate to the incapacitated person's personal care needs, [and to] assert the incapacitated person's rights and best interests . . . ." Former RCW 11.92.043(1)(e). When a guardian of the estate wishes "to apply funds not required for the incapacitated person's own maintenance and support," the guardian shall petition the court to spend those funds.[2] Former RCW 11.92.140 (2008). This includes spending funds for gifts and the making of contracts. *Id.*

Notwithstanding the statutory duties of a limited guardian, a person found incapacitated retains any rights not specifically revoked in the order appointing a limited guardian.

> A person shall not be presumed to be incapacitated nor shall a person lose any legal rights or suffer any legal disabilities as the result of being placed under a limited guardianship, except as to those rights and disabilities specifically set forth in the court order establishing such a limited guardianship.

Former RCW 11.88.010(2).

---

[2] In this case, Calhoun twice sought permission of the court to expend and manage Mesler's assets, including the transfer of her car to her grandson.

No. 37834-9-III
*In re Guardianship of Mesler*

In this case, the order appointing Calhoun as guardian of the estate authorized her to receive Mesler's income and invest her assets.[3] Mesler specifically retained the right to vote, marry, enter into a contract or will, buy and sell property, consent to or refuse medical treatment, and make decisions regarding the social aspects of her life. The order revoked her rights to appoint someone to act on her behalf, possess a driver's license, or decide who shall provide care and assistance.

A guardian requesting payment for services must demonstrate that the services were necessary, reasonable, and beneficial to the person and the estate. *See Guardianship of Lamb*, 173 Wn.2d at 190. In *Lamb*, the petitioners were professional guardians who were appointed as guardians of the person and estate for more than 20 Department of Social and Health Services clients residing in the guardians' residential habilitation center, Fircrest School. In addition to their specific services, the guardians spent time advocating and lobbying for preservation of residential habilitation centers such as Fircrest School. The guardians requested compensation for their advocacy activities. The trial court denied the fees as outside the scope of their guardianship.

The Supreme Court affirmed, noting that guardian fees are necessary fees charged by the guardian for services rendered on behalf of a client. *Id*. at 187. Under this "direct

---

[3] The order also authorized Calhoun to "do anything that a trustee can do under the provisions of RCW 11.98.070." CP at 20. Calhoun was not appointed as a trustee and this was not a trust action. Calhoun's duties and powers are established by the guardian chapter. Regardless, the parties do not contend that RCW 11.98.070 is applicable in this case.

29

No. 37834-9-III
*In re Guardianship of Mesler*

benefit" standard "a guardian may be compensated only for activities that are necessary and beneficial to the guardianship." *Id*. at 190. Thus, fees should not be allowed simply on the basis of work performed. *Id*. at 191. Instead, "the court must determine the need for the work performed and whether the work benefited the guardianship." *Id*.

In reviewing a request for fees, courts must jealously guard the interests of the incapacitated person. *Id*. at 192. The guardian is responsible to provide evidence to justify compensation from the incapacitated person's estate. *Id*. The expenditures of time and expense must be actually made and "'[i]t is the duty of the trial court in such a case to include in its findings the specific amounts it finds to have been so expended so that they can be challenged on appeal.'" *Id*. (quoting *Disque v. McCann*, 58 Wn.2d 65, 71, 360 P.2d 583 (1961)).

Whether fees are necessary, reasonable, and beneficial is a mixed question of fact and law. Necessary services include services that are authorized by statute, CPG Standards, or the order appointing a guardian. Whether services are authorized is a conclusion of law. If services are authorized, there is also a question of whether they are factually necessary. Services may be authorized and needed, but if they are duplicative, then they are factually unnecessary.

Whether services directly benefit the estate and the person is a question of fact. When providing services in the best interest of the person, the guardian "becomes the surrogate decision maker for the ward." *Id.* at 191. Thus, the "guardian must make

30

No. 37834-9-III
*In re Guardianship of Mesler*

decisions 'on a case-by-case basis with *particularized consideration of the best interests and rights of the specific individual.*'" *Id*. (quoting *In re Guardianship of Hamlin*, 102 Wn.2d 810, 815, 689 P.2d 1372 (1984)). Ultimately, the "goal of a guardianship is to do what the ward would do, if the ward were competent to make the decision in question." *Id*. at 191 n.13.

When a guardian is appointed over the person and the estate, the court must also determine if the services benefited the estate. *Id.* at 189-90. A benefit to the estate is measured by determining an increase or decrease in value. *Id.* The purpose of appointing a guardian of the estate is "'to preserve and conserve the ward's property for his own use, as distinguished from the benefit of others.'" *Id*. at 190 (quoting *In re Guardianship of Michelson*, 8 Wn.2d 327, 335, 111 P.2d 1011 (1941)). Thus, a guardian's decisions to provide services or incur fees shall reflect their fiduciary duty to conserve the estate. Services shall be provided in an efficient and cost-effective manner. Services requiring a minimal degree of training, skill, and experience should be billed at a lower rate. For example, under this standard, it is generally not in the estate's best interest to have a guardian charge $70 per hour to run to the store for milk and bread. *See Guardianship Best Practices Workgroup Report*, E-4 at https://www.courts.wa.gov/content/publicUpload/Guardian%20WINGS/Briefing%20II%20-%20Improving%20Service%20Delivery.pdf.

31

No. 37834-9-III
*In re Guardianship of Mesler*

Finally, the fees charges by a guardian must be "just and reasonable." Former RCW 11.92.180. What is just and reasonable is a question of fact. *Money Mailer, LLC v. Brewer*, 194 Wn.2d 111, 118, 449 P.3d 258 (2019). The factors to consider in determining whether fees are just and reasonable are overlapping and set forth in CPG Standard 410.2:

> 410.2.1 The necessity and quality of the services provided;
>
> 410.2.2 The experience, training, professional standing, and skills of the guardian or conservator;
>
> 410.2.3 The difficulty of the services performed, including the degree of skill and care required;
>
> 410.2.4 The conditions and circumstances under which a service was performed, including whether the service was provided outside regular business hours or under dangerous or extraordinary conditions;
>
> 410.2.5 The effect of the services on the individual;
>
> 410.2.6 The extent to which the services provided were or were not consistent with the guardian's plan or conservator's plan; and
>
> 410.2.7 The fees customarily paid to a person that performs a like service in the community.

In determining just and reasonable fees under these standards, the trial court will consider the competing equitable factors of compensation for work performed, protecting the alleged incapacitated person's right to autonomy and also protecting the incapacitated person's estate from excessive fees. *In re Guardianship of Decker*, 188 Wn. App. 429, 449, 353 P.3d 669 (2015).

No. 37834-9-III
*In re Guardianship of Mesler*

In this case, the trial court's findings are unsupported by the evidence and insufficient to provide meaningful review. As Mesler points out, there are numerous examples where the court did not independently review Calhoun's billings and apply these standards. For example, Mesler contends that fees Calhoun requested for attempting to put a security system in Mesler's home were unauthorized and unnecessary. While the trial court's written findings determined that Mesler requested this security system and then changed her mind, there is no evidence to support this finding (and thus findings of fact 1.51 and 1.52 are not supported by substantial evidence). During its oral ruling, the court recognized this deficiency, but nonetheless found:

> [T]his is one of these places where maybe she didn't want it, but it was certainly reasonable under the circumstances for the guardian to install the system in an effort to try to protect and keep Ms. Mesler safe, even if that's not what she wanted, and again, the issue here is not what did Ms. Mesler want or what does she think now that she wanted back then. The issue is what was reasonable or what was necessary and what was for her benefit.

RP at 76.

This reasoning is erroneous for several reasons. First, in determining whether this task was necessary, the court failed to consider whether Mesler retained the right to decide issues such as the installation of a home security system. Mesler was not deemed mentally incompetent, and she retained the right to enter into contracts. If Mesler retained this right, then her desires were relevant. Even assuming that Calhoun retained oversight of Mesler's right to enter into contracts, Calhoun was required to apply the

33

No. 37834-9-III
*In re Guardianship of Mesler*

substitute judgment standard to determine what Mesler wanted.[4]  Finally, before

disbursing funds "not required for the incapacitated person's own maintenance and

support," the guardian must petition the court to spend those funds.  Former

RCW 11.92.140.

Mesler also contends that Calhoun charged her $7,751.25 for errands, visits, and

shopping at an average billing rate of $76.81 per hour.  The court's only finding related to

errands was that "[t]he work charged at $50/hour was charged for errands and groceries."

CP at 893 (FF 1.26).  There is no finding that the errands were necessary, especially in

light of six hours of in-home care specifically retained to provide such services.  Nor is

there a finding that the specific errands and shopping benefited Mesler and her estate.

Finally, the court's finding that work charged at $50.00 per hour was for errands is not

the same as finding that Calhoun charged $50.00 per hour for running errands.

Mesler also challenged charges for scanning documents, pointing out that the rate

for this task was often charged at $125 per hour.  Calhoun testified, and the court made

---

[4] Under this standard, when making decisions for an incapacitated person a guardian's "primary standard for decision-making is the Substituted Judgment Standard based upon the guardian's determination of the incapacitated person's competent preferences, i.e. what the incapacitated person would have decided when he or she had capacity.  The guardian shall make reasonable efforts to ascertain the incapacitated person's historic preferences and shall give significant weight to such preferences." Appellant's Opening Br., App. C at 8 (CPG Standard 405.1); *see Guardianship of Lamb*, 173 Wn.2d at 191 n.13 ("The goal of a guardianship is to do what the ward would do, if the ward were competent to make the decision in question.") (citing *In re Guardianship of Ingram*, 102 Wn.2d 827, 838, 689 P.2d 1363 (1984)).

No. 37834-9-III
*In re Guardianship of Mesler*

findings that the task of scanning often included review of the document, distribution,

and decision making. These findings are not supported by the evidence.

Calhoun has a duty to clearly describe the work being performed, the time it takes

to perform the task, and the hourly rate being charged. She also has a duty to provide

services in an efficient and cost-effective manner. Services requiring a minimal degree of

training, skill, and experience should be billed at a lower rate. *See Estate of Larson*, 103

Wn.2d at 531 ("[A]n attorney is not entitled to fees at professional legal rates for tasks

that should be performed by staff, such as depositing checks in a bank."). As Mesler

points out, Calhoun's billing is filled with notations such as scanning a Walmart receipt

at a rate of $110 to $125 per hour. To the extent that the superior court found such

charges to be necessary, reasonable, and beneficial, such a finding is manifestly

unreasonable.[5]

Although the trial court made findings that this particular guardianship was more

complex and contentious than normal, there are no findings to indicate a standard fee for

a typical guardianship. For example, as Calhoun's witness pointed out, for certain

Medicaid eligible clients, the maximum monthly allowance for a guardianship fee is

---

[5] One of Mesler's witnesses attempted to group Calhoun's billing by task to show the aggregate charges by task and the average billing rate for those tasks. The court found this witness was not qualified to categorize Calhoun's billing entries. While it is not clear what qualifications a witness needs to sort and group billing entries, Calhoun had the burden to provide this information.

No. 37834-9-III
*In re Guardianship of Mesler*

$235. WAC 182-513-1530(2)(b)(iii). As the court in *Guardianship of Lamb* noted, this fee is considered adequate to cover usual and customary guardianship services including "managing the client's financial and property affairs, making health care decisions, visiting the client, communicating with the client's service providers, and preparing reports for the court." 173 Wn.2d at 188. Additional fees may be requested for extraordinary services for complex transactions and substantial interactions with other agencies. *Id*.

In this case, the monthly budget allowance for Calhoun's fees was originally set at $300 per month, suggesting this is a typical fee for a guardian. Mesler presented expert testimony that a typical guardianship fee would be $500 per month. Calhoun did not present any evidence of a typical guardian fee and the court did not make any specific findings on a standard guardianship fee. Without setting a starting point, the court's finding that this case was more complex and contentious than a "typical guardianship" is untethered. Was it so complex and contentious that it justified guardian fees 10 times the normal rate?

In *Guardianship of Decker*, the former attorney of a person found incapacitated appealed a commissioner's ruling that limited his attorney fees and disgorged fees already paid. 188 Wn. App. 429. The incapacitated person disputed the guardianship petition and the court appointed attorney Daniel Quick to represent her interests in the petition. The order appointing Quick approved an hourly rate of $250 and capped the

36

No. 37834-9-III
*In re Guardianship of Mesler*

authorized time at 10 hours of representation without prior court approval. *Id.* at 434. At a later time, the court authorized an additional 40 hours of representation. *Id.* The incapacitated person continued to object to the guardianship petition and did not cooperate with the guardian ad litem.

After Decker was deemed incapacitated, Quick moved for approval of his attorney fees in the amount of $118,110.65 that had already been paid and an additional unpaid balance of $17,137.50. In support of his motion, he submitted "lengthy billing summaries." *Id*. at 437. The commissioner approved a total fee of $30,000 and ordered any fees paid above this amount to be disgorged.

After concluding that the commissioner could limit attorney fees incurred prior to a determination that a person is incapacitated and rejecting a lodestar analysis in determining the amount, the court upheld the commissioner's limit on fees and order for disgorgement as just and reasonable under former RCW 11.92.180. *Guardianship of Decker*, 188 Wn. App. at 449. The court recognized the commissioner's findings that Quick took a risk exceeding the limits on representation. *Id*. at 450. The commissioner also found the requested fees unreasonable because no matter how difficult the client was to work with or how much work she wanted, Quick had a duty to consider the context. While the difficulty of the case justified some additional funds, a just and reasonable fee was nowhere near the fees already paid. The court upheld the reduced fee of $30,000, finding that

No. 37834-9-III
*In re Guardianship of Mesler*

> [t]he trial court balanced Decker's right to contest a guardianship and protect her autonomy by paying an attorney, and the competing need to protect Decker's estate from excessive attorney fees. *These considerations are central to the trial court's responsibility to protect the ward's person and estate.*

*Id.* at 450-51 (emphasis added).

In this case, as in *Decker*, the fees requested by Calhoun are substantial because the incapacitated person was difficult to work with. Regardless of the work performed or the difficulties she encountered, Calhoun is only entitled to fees that are necessary, reasonable, and beneficial to the person and the estate. In making this determination, the court must take into account its responsibility to protect Mesler's estate from excessive guardian fees. The trial court's findings are insufficiently detailed to provide effective appellate review of the decision to approve Calhoun's fees in its entirety.

G.    SUPERIOR COURT'S EVIDENTIARY RULINGS

While we reverse and remand, we address some of Mesler's evidentiary objections because they may come up in subsequent hearings. Mesler argues that the trial court erred in disregarding certain declarations. Specifically, she contends that the superior court erred in concluding that "Ms. Mesler failed to provide competent, admissible expert witness testimony regarding whether the guardian's fees and services were reasonable, necessary and to the benefit of Ms. Mesler." CP at 898 (COL 2.21).

We agree that this conclusion of law is not supported by the findings of fact or the evidence presented. The superior court found that Mesler's experts were less credible

38

No. 37834-9-III
*In re Guardianship of Mesler*

because they failed to appreciate the complexities of the case.  But discounting the weight given to a witness's testimony is not the same as ruling that the witness is not competent or the evidence is not admissible.  Here, the superior court made no such evidentiary rulings.

As we noted above, the trial court was tasked with deciding disputed facts. "An essential function of the fact finder is to discount theories which it determines unreasonable because the finder of fact is the sole and exclusive judge of the evidence, the weight to be given thereto, and the credibility of witnesses."  *State v. Bencivenga*, 137 Wn.2d 703, 709, 974 P.2d 832 (1999) (citing *State v. Snider*, 70 Wn.2d 326, 327, 422 P.2d 816 (1967)).  The Court of Appeals is not a trial court and we do not provide a second opportunity to argue and decide disputed facts.  Nor do we reweigh the evidence. *Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 485, 40 P.3d 1221 (2002).

It was completely within the trial court's function to determine which witnesses were credible and which witnesses were not.  Notwithstanding the fact-finder's province, we take note that an expert's lack of understanding of the complexities of a case would not necessarily undermine the witness's opinion on a reasonable hourly rate or a typical fee for a standard guardianship.  Nor should the burden be on Mesler to produce this type of evidence.

Mesler also assigns error to the trial court's refusal to consider her own declaration because the trial court did not believe she could have written it herself.  The fact that

39

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37834-9-III
*In re Guardianship of Mesler*

Mesler did not "write" her declaration should not be grounds for disregarding it. Mesler

cannot speak or write effectively, but she is not incompetent and she is entitled to testify.

*See* former RCW 11.88.045(3) (2001). If the court is concerned that her declaration is

being influenced, it should at least take note of Mesler's positions in the GAL report.

Finally, Mesler challenges the trial court's decision to discount evidence of Senior

Avenue's profit margins and bar cross-examination of Calhoun on the pay rates of her

employees as evidence that the fees and rates charged by Calhoun were unreasonable. In

support of her argument, Mesler points out that a guardian is ethically prohibited from

profiting from any transaction made on behalf of the incapacitated person's estate. She

contends that Calhoun's agency, Senior Avenues, was a for-profit business and was

making a profit from charging guardian fees. Given this business model, Mesler

contends that Senior Avenues had an incentive to generate excessive fees and charge

excessive rates. She argues that evidence of employee pay rates and overhead costs is

relevant to determining whether the hourly rates and fees charged for guardian services is

reasonable.

Evidence is relevant if has a tendency to make the existence of any fact of

consequence more or less probable. ER 401. The evidence of Calhoun's profit margins

is irrelevant. A professional guardian is entitled to be paid for services as determined by

the court and Mesler does not contend otherwise. The authorized fees are determined

after considering the factors set forth in this opinion. There is nothing in the statutes or

40

No. 37834-9-III
*In re Guardianship of Mesler*

case law suggesting that a guardian's fees are based on the guardian's profit margin.

Instead, fees must be reasonable, necessary, and beneficial to the estate and the person.

*See Estate of Larson*, 103 Wn.2d at 522-23.

H.      ATTORNEY FEES ON APPEAL

Mesler requests attorney fees and costs on appeal under RAP 18.1 and

RCW 11.96A.150.  She does not articulate by whom these fees should be paid, but her

argument suggests that the fees and costs should be assessed against Calhoun so that the

estate is not further diminished.  Calhoun requests an award of attorney fees against Mr.

Young for filing a frivolous appeal.

Under RCW 11.96A.150(1), we may order costs, including reasonable attorney

fees, to be awarded to any party from any party to the proceedings.  Mesler has

substantially prevailed on appeal.  We award Mesler her attorney fees and costs from the

estate, to be determined by the trial court on remand, after consideration of the factors we

have set forth above.  We deny Calhoun her attorney fees on appeal.

CONCLUSION

We find that the trial court abused its discretion when it failed to consider the CPG

Standards in determining the minimum duties of a certified professional guardian.  We

also conclude that the superior court's findings of fact are insufficient to provide

meaningful review of the authorized fees and costs of $54,224.59.  We also hold that the

trial court abused its discretion by presuming that Calhoun was entitled to compensation

41

No. 37834-9-III
*In re Guardianship of Mesler*

for work performed and placing the burden on Mesler to prove that the fees were not necessary, reasonable, and for the benefit of the person and the estate. Despite the evidence presented, the court entered conclusory findings that all of the work performed by Calhoun was necessary, beneficial, and reasonable while providing very little independent review of the charges.

We reverse the order authorizing these fees and costs and remand for the trial court to enter sufficient findings, recognizing that this may require the court to reconsider evidence already submitted and consider new evidence that may be relevant. The court needs to make specific findings on (1) which tasks benefited the person and the estate, (2) what work was necessary to pursue those tasks, (3) the reasonableness of the hours billed to perform the needed work, and (4) the propriety of the hourly rate. *See Guardianship of Hallauer*, 44 Wn. App. at 800-01.

In order for the court to make an independent evaluation, Calhoun will need to organize her billings by specific task, demonstrate that the task was in the best interest of Mesler and her estate, the work was necessary to complete those tasks and was not duplicative, the time it took to complete those tasks was reasonable, and the rate she charged for the particular tasks. Such detailed support would likely not be required if Calhoun's monthly fees consistently stayed within a budgeted amount that was typical for guardian fees. But given the significant fees being requested by Calhoun, the superior court needs to carefully scrutinize and independently examine all of her requested fees in

No. 37834-9-III
*In re Guardianship of Mesler*

order to jealously guard the rights and interests of the incapacitated person and protect

her estate.

    Reversed and remanded.

_____
Staab, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.